UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANTHONY COBBS,

          Plaintiff,

                              Civil Action No.
                              11-CV-12142

vs.

                              HON. MARK A. GOLDSMITH

ALFINO DONASTORG, el al.,

          Defendants.

_____/

**OPINION AND ORDER GRANTING IN PART THE SUMMARY JUDGMENT
MOTION OF DEFENDANTS DONASTORG AND PECK and REMANDING STATE
LAW CLAIMS AGAINST ALL DEFENDANTS**

## I.  INTRODUCTION

In this case, Plaintiff Anthony Cobbs has asserted excessive force claims under 42 U.S.C. § 1983 with pendent assault and battery claims under Michigan law.  Defendants are two Flint police officers, Alfino Donastorg and Mark Peck, and a Hurley Medical Center ("Hurley") security guard, Mark Mitchell (collectively "Defendants").  Plaintiff claims that Defendants used excessive force against him and assaulted/battered him while effectuating his arrest at Hurley on February 19, 2009.[1]

Now before the Court are two motions for summary judgment, one filed jointly by Donastorg and Peck, and the other filed by Mitchell.  The matters are fully briefed and oral argument was heard on June 28, 2012.  For the reasons that follow, the Court will grant summary

---

[1] In the presently governing first amended complaint, Plaintiff asserts excessive force and assault and battery claims against all three Defendants; however, in his motion papers, Plaintiff expressly states that he is not asserting an excessive force claim against Mitchell.  Pl. Resp. to Mitchell's Mot. at 8 (Dkt. 44).  Therefore, that claim is summarily dismissed, and the only claims remaining against Mitchell are assault and battery claims under Michigan law.

judgment in favor of Donastorg and Peck as to Plaintiff's excessive force claim under § 1983, based on qualified immunity, and decline to exercise continued supplemental jurisdiction over the pendant state law claims asserted against all three Defendants.  Those claims will be remanded.

## II.  BACKGROUND

### A.  Principal Players

There are five principal players in this litigation: the four parties and Plaintiff's fiancé, Coby Wilhelm.  Plaintiff is a thirty-one-year-old African-American male with a history of medical problems, including high blood pressure, hypertension, depression, and anxiety.  Cobbs Dep. at 17, 19 (Dkt. 43-2).  Wilhelm is a forty-two year-old white female with a history of severe manic depression, pulmonary tuberculosis, and fibromyalgia, for which she takes several pain management and "psyche medications" daily.  Wilhelm Dep. at 6, 7-8, 40 (Dkt. 43-3).

The physical description of each defendant is pertinent because Plaintiff and Wilhelm refer to the various defendants by their physical descriptions and not by their names.  Defendant Mark Mitchell is a white male, approximately 6'5" in height, and weighs approximately 275 pounds.  Mitchell Dep. at 9 (Dkt. 43-4).  Mitchell is considerably heavier than the other defendants.  Mitchell has been a security guard at Hurley in Flint, Michigan, for over thirty years, serving as a supervisor for the past five years.  Id. at 14.  On the day in question, Mitchell was wearing his Hurley security guard uniform, consisting of a dress shirt and pants, a tie, an identification badge, and an equipment belt to which a ring of keys, a set of handcuffs, and a radio were attached.  Id. at 17, 20.  After the incident giving rise to this lawsuit, Mitchell authored an incident report dated February 19, 2009.  See Mitchell Incident Report (Dkt. 36-7).

On the day in question, Mitchell was assisted by non-party Mickey Ferguson, a male security guard at Hurley.  Mitchell Dep. at 20.  Ferguson's physical description is not provided.

Defendant Alfino Donastorg is a bi-racial male, with brown or light-brown skin. Donastorg Dep. at 6-7 (Dkt. 43-5).  He is 5'11" in height and weighs 195 pounds.  Id.  Donastorg has been a Flint police officer for eighteen years, and was previously a Hurley security guard. Id. at 14-15.  On the day in question, Donastorg was stationed at Hurley to provide police presence in the emergency room.  Id. at 19; Mitchell Dep. at 19.  Donastorg was wearing his police uniform, consisting of a dark blue suit, his badge and patches, a police-issued gun, handcuffs, mace, a baton, and a collapsible baton.  Donastorg Dep. at 19.  Of the principal players in this litigation, Donastorg was the only one carrying a baton on the day in question.

Defendant Mark Peck is a white male, approximately 6'2" in height, and weighs 185 pounds.  Peck Dep. at 14 (Dkt. 43-6).   Peck has been a Flint police officer for twenty-one years. Id. at 10.  On the day in question, Peck was patrolling the Kettering University area, which includes Hurley.  Id. at 11.  Peck was wearing his Flint police uniform equipped with a police-issued gun, two pairs of handcuffs, a flashlight, radio, and pepper spray.  Id. at 15.  He was not carrying a baton or similar weapon.  Id.

### B.  The Incident

The five principal players in this litigation provide varying descriptions of the events forming the basis for this lawsuit.  The testimony of the three Defendants is more or less consistent.  The degree of variance between the versions of Plaintiff and Wilhelm, on the one hand, and the three Defendants, on the other hand, is extreme.

3

## 1. Plaintiff's & Wilhelm's Versions

On February 19, 2009, the day of the incident giving rise to this lawsuit, Plaintiff was experiencing symptoms related to high blood pressure, causing him to "stumble and stagger" and become "light-headed." Cobbs Dep. at 50, 54. These symptoms prompted Plaintiff's visit to Hurley.[2] Upon arrival at Hurley, Plaintiff approached the reception desk, presented his identification, and was told to wait until a nurse was available. Id. at 54-55. After about an hour, Plaintiff was called back to the nurse's station, sometimes referred to as the triage area, to be seen. Id. at 56.

At this point, Wilhelm exited the hospital to smoke. Wilhelm Dep. at 13-14. Thus, she did not witness the events that immediately ensued, as described below. Id.

Plaintiff testified that his interaction with the attending nurse was calm and did not involve yelling, arguing, or swearing. Cobbs Dep. at 58-59, 62. Plaintiff testified that he

---

[2] How Plaintiff got to the hospital is disputed by the parties, but the issue is ultimately not material to the resolution of the motions before the Court. However, the competing versions illustrate the extent to which Plaintiff's testimony is contradicted by other record evidence whose reliability would not seem to be in question.

According to signed DVA Ambulance records, Plaintiff was taken from his job at a party store, known as "Pick Quick," to the hospital via ambulance, complaining of anxiety. Mitchell Mot. at Ex. A (Dkt. 39-2); Cobbs Dep. at 11. The DVA Ambulance records contain detailed information about Plaintiff, such as his social security number and contact information. Id. The document also recounts Plaintiff's vital signs on the day in question, and states in the section entitled "narrative," among other things, that Plaintiff indicated that he had not taken his prescribed medicine on the day in question. Id.

On the other hand, Plaintiff testified that his cousin, Lashawn Hodges (who was not deposed), and Wilhelm drove him to the hospital. Cobbs Dep. at 46. During his deposition, Plaintiff repeatedly denied that he was taken to the hospital in an ambulance. He testified that if there are records to that effect, they are wrong. Id. at 46-47; 51-52. Wilhelm testified that she did not recall how Plaintiff got to the hospital, but she and Plaintiff were at their home immediately before going to the hospital. Wilhelm Dep. at 9, 35. Wilhelm repeatedly stated that Plaintiff's hospital visit was prompted by the symptoms he testified to experiencing, as well as his depression. Id. at 21, 45, 61. However, Plaintiff testified that he was "feeling happy" that day. Cobbs Dep. at 46.

motioned with his arms to describe his symptoms and to show the nurse that pain was emanating from his left arm.[3]  Id. at 59.  At this point, Plaintiff testified that an African-American Hurley security guard approached and told Plaintiff to leave the hospital for being disruptive and arguing with the nurse.  Id. at 60, 62-63.  Plaintiff testified that he does not know the name of the security guard, but that he was African American, "maybe a little taller than me and maybe the same height [as] me."  Id. at 63.  Another Hurley security guard was also present assisting the above-described guard.  Plaintiff described him as a "heavyset," "fat," "black guy."  Cobbs Dep. at 64.  The Court refers to the first guard (the one who initially told Plaintiff to leave and began escorting Plaintiff to the exit) as the "primary Hurley guard," and the second guard (the "fat" one) as the "secondary Hurley guard."  Plaintiff denies that he was being disruptive, and states that he was asked to leave "for no reason."  Id. at 62-63, 65.

Notably, Plaintiff testified that both the primary and secondary Hurley security guards are African American.  The record is undisputed that Mitchell, the only Hurley security guard who is named as a Defendant, is white.  Consequently, there is no Defendant in this case who matches Plaintiff's description of the two Hurley security guards, and therefore the actions of those two unknown guards cannot be imputed to any of the three Defendants.

At this point, Plaintiff testified that the primary Hurley guard began walking him to the exit.  Id. at 63.  Specifically, according to Plaintiff, the guard forced him out of his seated position, twisted his left arm behind his back, and began escorting him to the exit.  Id. at 69-70.  Plaintiff testified that he became "a little upset" and began to yell at this point.  Id. at 67-68.  Plaintiff told the guards that he did not understand why he was being forced to leave and said

---

[3] Later in his testimony, Plaintiff admits that using his hands and waving his arms probably started the entire incident.  Cobbs Dep. at 72.

"what if I have a stroke? . . . It's going to be y'all's fault." (referring to the guards). Id. at 63-64. According to Plaintiff, the secondary Hurley guard responded to Plaintiff's comments by calling Plaintiff a "smart SB," and "slammed [Plaintiff] up against the [hospital] wall." Id. at 63-64. At this point, Plaintiff testified that he was yelling at the guards and saying statements to the effect of "this is uncalled for . . . I'm here for help." Id. at 74.

Again, the conduct of the primary and secondary Hurley security guards, as just described, is irrelevant for the present purposes because Plaintiff testified that the two guards were African American, and it is undisputed that the only Hurley security guard named as a party defendant – Mitchell – is white.

Plaintiff testified that, as he was pinned against the hospital wall, he first noticed a police officer in the vicinity observing the events. Id. at 71. Later in his testimony, Plaintiff identified the first officer he saw – and the officer present as Plaintiff was being pinned against the hospital wall – as "[t]he white cop." Id. at 76-77. At around this time, Plaintiff testified that he was "slammed on the floor," where he hit his head on the concrete and lost consciousness. Id. at 35-36, 72, 81. Plaintiff testified that he was slammed to the floor by "the security guard and one of the police," without giving a description of the two individuals who slammed him. Id. at 75.

At this point Plaintiff lost consciousness, and does not remember the events that occurred next. Wilhelm, though, testified that she observed the events occurring while Plaintiff was unconscious as she was returning to the hospital from smoking outside. Wilhelm Dep. at 19, 27. Thus, Plaintiff relies on Wilhelm's testimony to fill the void. According to Wilhelm, two Flint police officers and one Hurley security guard were standing with Plaintiff beside a police vehicle. Id. at 20. Wilhelm testified that she observed Plaintiff tell these three individuals that he was there seeking medical help for his high blood pressure and that he was depressed over his

deceased mother, to which one of the police officers responded that he didn't "give an F about your dead mother."  Id. at 21.  Wilhelm testified that Plaintiff "was complaining of his arm hurting him.  Then they told him to put his arms behind his back, and he told them he couldn't put his left arm back there again, his left arm was hurting."[4]  Id. at 28.  At this point, the officer, who Wilhelm testified was "white," hit Plaintiff across the base of his shoulders forcefully with a baton and "[s]lammed him face first into the ground."[5]  Id. at 21-22, 24.  According to Wilhelm, Plaintiff first fell to his knees, at which point "they forcefully pushed his face to the ground."  Id. at 25.

Notably, the record is undisputed that, of the three Defendants, only one of them – Donastorg – was carrying a baton or similar weapon on the day in question.  The record is also undisputed that Donastorg is bi-racial, not white.

When Plaintiff was flat on the ground, Wilhelm testified that a "black cop" used his foot to pin Plaintiff to the ground, at which point Plaintiff was handcuffed.[6]  Id. at 44, 50.  Then, according to Wilhelm, a Hurley security guard, who Wilhelm testified was "white,"[7] grabbed

---

[4] Wilhelm's testimony that Plaintiff was speaking (and thus conscious) is in direct conflict with Plaintiff's testimony that he was unconscious.

[5] Wilhelm testified that upon her return from smoking, Plaintiff called to her, from where he stood with the guard and officers, saying "I'm right here, I'm right here."  Wilhelm Dep. at 52, 58.  She testified: "I walked toward him and the police officer told me to get back. And I told him well, he's my fiancé, I want to know what's going on.  They told me it was none of my business."  Id. at 58.

[6] Wilhelm testified that she asked each officer and guard for their name and badge number and wrote the information down in a notebook, which she later misplaced.  Wilhelm Dep. at 22-23.  Later in her testimony, however, Wilhelm states that she did not speak to any hospital security personnel, nor anyone from the police department, about the incident.  Id. at 56.

[7] Conversely, as noted above, Plaintiff testified that the two security guards involved were African American.  Thus, Wilhelm's testimony is inconsistent with Plaintiff's testimony regarding the races of the security guards present.

Plaintiff by his left arm (his injured arm) and, when Plaintiff exclaimed that it hurt, the "white police officer" responded "I don't give a sh (phonetically) about your arm."[8] Id. at 25, 36.

At this point, Plaintiff regained consciousness and asked the officers "what was going on," and was told that he was arrested for "being loud and irate in the hospital." Cobbs Dep. at 72. He testified that the officers then brought him to his feet, placed him in a police cruiser, and "light-skinned [African-American] police officer" took him to the police station for booking. Id. at 73, 76-77. Plaintiff testified he was released from jail one day after the incident. Cobbs Dep. at 27. Wilhelm testified Plaintiff was held in jail for three days after the incident. Wilhelm Dep. at 32.

### 2. Peck's Version

Of the principal players in this litigation, Peck is the only white police officer. Peck testified that he was not carrying a baton or similar instrument on the day of the incident. Peck Dep. at 15.

Peck testified that he was initially called to the scene for the purpose of assisting another officer with an arrest. Id. at 12. Peck testified that, by the time he arrived at the scene, Plaintiff was already arrested and seated in the back of Donastorg's police cruiser. Id. at 18. Peck further testified that he had no physical contact whatsoever with Plaintiff, and did not even talk to him until the booking process, which occurred at the police station. Id. at 19.

### 3. Mitchell's Version

Mitchell testified that he received a call from Ferguson requesting his presence in the triage area. Mitchell Dep. at 20. Mitchell testified that he reported to triage to find Plaintiff being "uncooperative" with, "yelling," "screaming," and "hollering" at, and "using profanity

---

[8] Plaintiff testified that he was unconscious at this time. Cobbs Dep. at 72-73.

towards," the nursing staff.  Id. at 25-26.  For example, Mitchell testified that he observed Plaintiff say to a female nurse, "don't touch me mother fucker" and "[y]ou're not touching me bitch."  Id. at 26.

Mitchell further testified that he observed Ferguson trying to calm Plaintiff down.  Id. at 28.  At this point, according to Mitchell, Plaintiff was noncompliant and, accordingly, a nurse asked that Plaintiff be removed, prompting Mitchell to approach Plaintiff and ask him to leave.  Id. at 31.  Mitchell testified that he observed Plaintiff walk towards the door, at which time he "looks at Officer Ferguson and states that he'll be back later on to burn this bitch down."  Id.

At this time, according to Mitchell, Donastorg appeared and the following ensued: "Mr. Cobbs takes a defensive stance, puffs out his chest, his hands are clinched, and basically bumps into Officer Donastorg."  Id. at 33.  According to Mitchell, this "chest to chest" bumping occurred inside the hospital.  Id.  at 34, 37.  Mitchell admits that, because Plaintiff and Donastorg were standing in extremely close proximity to one another, he could not tell whether the bump was intentional or accidental.  Id. at 34-35.  After the bump, Mitchell testified that he observed Donastorg take Plaintiff to the ground, but could not remember how the takedown occurred, other than that Donastorg fell to the ground with Plaintiff alone (with no other assistance).  Id. at 35, 38-39.  Mitchell could not recall whether Plaintiff was pushed up against a wall before the take down occurred.  Id. at 43, 47.  Mitchell testified that he assisted Donastorg in handcuffing Plaintiff, and that Plaintiff was resisting.  Id. at 39-40.  At this point, according to Mitchell, he and Donastorg helped Plaintiff to his feet by lifting him up from underneath his arm.  Id. at 41.  Mitchell testified that Peck was not present yet at the scene while the takedown occurred.  Id. at 43.  Moreover, according to Mitchell, no one hit Plaintiff with a baton.  Id. at 55.

9

#### 4.  Donastorg's Version

On the day of the incident, Donastorg was summoned via radio to the triage area of the emergency room, to find Plaintiff "cursing, telling everybody – telling security or whoever not to touch him, don't touch him."  Donastorg Dep. at 21, 26.  Donastorg testified that Plaintiff was "yelling" but not "screaming," that his voice "sounded angry," and that he was saying things to the effect of "don't put your hands on me" and using the "F word."  Id. at 26-27.  At this time, Donastorg testified that he was "monitoring the situation," and that he observed Hurley security guards verbally try to persuade Plaintiff to leave.  Id. at 28.  Donastorg testified that, when Plaintiff still refused to leave after a few minutes, he "stepped in . . . and asked him to leave several times and told him if he would not leave, he would be arrested for trespassing."  Id. at 31.  According to Donastorg, Plaintiff responded by saying, in an "elevated" voice (but not yelling or screaming), "I'm not leaving" and that "nobody better touch him."  Id. at 33.  At this point, Donastorg testified that he told Plaintiff that he was going to touch him, and proceeded to "[p]ut my hand on his [Plaintiff's] back and start to give him a little shove to push him out of the chair."  Id. at 34.  According to Donastorg, Plaintiff then "jumped out of the chair and pushed" him with the palm of his hand.  Id. at 34-35.  At this point, Donastorg testified that he and Mitchell "pushed [Plaintiff]" and "wrestled him" to the floor.  Id. at 36, 38.  Donastorg testified that Plaintiff actively resisted: "He pushed, he shoved, he tried to get away."  Id. at 37.  Donastorg testified that Plaintiff's head did not hit the floor.  Id. at  39.

Once Plaintiff was on the ground, Donastorg testified that he held Plaintiff down and told him to put his hands behind his back because he was under arrest.  Id. at 42.  According to Donastorg, Plaintiff did not comply with Donastorg's commands and instead "continued to resist."  Id.  Donastorg testified that Plaintiff did not state that he was in any pain.  Id. at 43-44.

Donastorg testified that he then secured Plaintiff in handcuffs and took him outside to his cruiser, where he first saw Peck.  Id. at 45.  Donastorg testified that he never struck Plaintiff with a baton, id. at 46, nor did he see anyone else do so.  Id. at 53.  So far as Donastorg is aware, Plaintiff never lost consciousness during the incident.  Id. at 50-51.

### III.  SUMMARY JUDGMENT STANDARD

A court "shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When evaluating a summary judgment motion, "the evidence should be viewed in the light most favorable to the non-moving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

> Summary judgment is appropriate if, after an opportunity for discovery, the moving party demonstrates that there is no genuine issue of material fact as to the existence of an element essential to the non-moving party's case and on which the non-moving party would bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Once the moving party carries its initial burden of showing that no genuine issues of material fact are in dispute, the burden shifts to the non-moving party to come forward with specific facts to show that there is a genuine issue for trial.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 474 U.S. 574, 587 (1986).  To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable jury could find for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Martin v. Ohio Turnpike Comm'n, 968 F.2d 606, 608-09 (6th Cir. 1992).

For the purposes of ruling on a summary judgment motion in which the "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  Scott v. Harris, 550 U.S. 372, 380 (2007).

11

## IV.  THE SUMMARY JUDGMENT MOTION OF DONASTORG & PECK

Donastorg and Peck argue that they are entitled to summary judgment with regard to Plaintiff's excessive force claims because they are entitled to qualified immunity.  The Court agrees.

The doctrine of qualified immunity shields government actors performing discretionary duties from civil liability so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  To determine whether a defendant is entitled to qualified immunity, courts ask two questions: (1) "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right[,]" and (2) was the right "clearly established" to the extent that a reasonable person in the officer's position would know that the conduct complained of was unlawful?  Saucier v. Katz, 533 U.S. 194, 201 (2001) overruled on other grounds by Pearson v. Callahan, 555 U.S. 223 (2009).[9]  "Once raised, the plaintiff bears the burden of showing that a defendant is not entitled to qualified immunity."  Bletz v. Gribble, 641 F.3d 743, 750 (6th Cir. 2011).  Moreover, when analyzing a summary judgment motion based on qualified immunity, courts must adopt the plaintiff's version of the facts.  Parsons v. City of Pontiac, 533 F.3d 492, 500 (6th Cir. 2008).

With regard to the first element of the Saucier framework, a claim of excessive force brought under 42 U.S.C. § 1983 requires a showing of evidence that establishes "(1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of [] law."  Marvin v. City of Taylor, 509 F.3d 234, 243 (6th Cir.

---

[9] Saucier mandated that the two questions be addressed in order, but that requirement has since been relaxed.  See Pearson, 555 U.S. at 236 ("On reconsidering the procedure required in Saucier, we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory.").

2007).  Only the first element is in dispute here.  Excessive force claims are analyzed using the

Fourth Amendment's "objective reasonableness standard."  Graham v. Connor, 490 U.S. 386,

395 (1989).  It is well established that law enforcement has "the right to use some degree of

physical coercion or threat thereof" to effectuate an arrest, when it is reasonable and the situation

requires it.  Id. at 396.  To determine if the force used in a particular instance was objectively

reasonable, and therefore not excessive, a court must look at the totality of the circumstances

surrounding the arrest, specifically "the severity of the crime at issue, whether the suspect poses

an immediate threat to the safety of the officers, and whether he is actively resisting arrest or

attempting to evade arrest by flight."  Id. "[T]he calculus of reasonableness must embody

allowance for the fact that police officers are often forced to make split-second judgments – in

circumstances that are tense, uncertain, and rapidly evolving," thereby requiring courts to accord

a degree of deference to officers' on-the-spot judgments.  Id. at 396-97.  Moreover, "[t]he

'reasonableness' of a particular use of force must be judged from the perspective of a reasonable

officer on the scene, rather than with the 20/20 vision of hindsight."  Id. at 396.

With regard to the second element of the Saucier framework, "[a] Government official's

conduct violates clearly established law when, at the time of the challenged conduct, the contours

of a right are sufficiently clear that every reasonable official would have understood that what he

is doing violates that right."  Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2083 (2011) (internal

quotation marks and brackets omitted).  As explained by the Supreme Court:

> Because the focus is on whether the officer had fair notice that her conduct was
> unlawful, reasonableness is judged against the backdrop of the law at the time of
> the conduct.  If the law at that time did not clearly establish that the officer's
> conduct would violate the Constitution, the officer should not be subject to
> liability or, indeed, even the burdens of litigation.

Brosseau v. Haugen, 543 U.S. 194, 198 (2004). The Sixth Circuit has instructed that there are two ways to establish the "clearly established" prong:

> Brosseau leaves open two paths for showing that officers were on notice that they were violating a "clearly established" constitutional right—where the violation was sufficiently "obvious" under the general standards of constitutional care that the plaintiff need not show "a body" of "materially similar" case law, and where the violation is shown by the failure to adhere to a "particularized" body of precedent that "squarely govern[s] the case here." Lyons has not satisfied either requirement for showing the violation of a "clearly established" constitutional right.

Lyons v. City of Xenia, 417 F.3d 565, 579 (6th Cir. 2005) (citations to Brosseau omitted). Thus, qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986).

Under Plaintiff's and Wilhelm's versions of the events, there are only two specific instances of force purportedly perpetrated by Donastorg or Peck that could constitute excessive force. The first is when, according to Plaintiff, Plaintiff was slammed to the floor by an undescribed police officer (along with a Hurley security guard). The second is when, according to Wilhelm, a "white" police officer hit Plaintiff with a baton and slammed Plaintiff to the ground.

With regard to the first purported instance of excessive force, putting aside the problematic fact that Plaintiff has failed to identify the culpable police officer, the Court concludes that the actions of this unknown officer do not amount to excessive force under the circumstances described by Plaintiff. Although the extent to which Plaintiff was acting in a disruptive and threatening manner is disputed, Plaintiff's own testimony establishes that: (i) he was gesticulating with his hands in a manner that Plaintiff essentially admits may have been threatening, see Cobbs Dep. at 72, (ii) he was yelling, id. at 67-68, 74, (iii) he was talking back to the guards when they were attempting to remove him from the hospital, id., and (iv) the

14

unknown police officer observed Hurley security guards physically restraining Plaintiff by pinning him against a wall.  Id. at 71.  Unquestionably, a reasonable police officer observing these events – that is, a patient who is upset and yelling at hospital security guards, leading to a physical confrontation ending in the security guards physically restraining the patient – is justified in intervening to secure the patient in custody and diffuse an increasingly volatile situation that is taking place in an area of the hospital where bystanders are present.  At the very least, crediting Plaintiff's version of the events, as described above, the conduct of the unknown officer falls into "the hazy border between excessive and acceptable force," Ashcroft, 131 S. Ct. at 2083-84, such that qualified immunity attaches.  See, e.g., Lyons, 417 F.3d at 579 (no squarely governing precedent or obvious constitutional violation where officer responding to request for backup from distressed officer tackles plaintiff after observing other officer and plaintiff yelling at each other in close proximity).  Lyons is analogous to the present case and controlling here.

The second instance of purported excessive force, according to Wilhelm's version of the events, is when the "white" police officer allegedly hit Plaintiff with a baton and slammed Plaintiff to the ground.  These actions, if believed by a jury, cannot sustain an excessive force claim against either Peck or Donastorg for two reasons.  First, there is no evidence that one of the two police officers who are Defendants herein is culpable for the baton strike.  The record is undisputed that the only white police officer who is a Defendant herein – Peck – (i) was not present at the time Plaintiff was allegedly struck by the baton, and (ii) was not carrying a baton.  Therefore, even if a jury credited Wilhelm's testimony that Plaintiff sustained a baton strike by a white police officer, a jury could not – in light of the two uncontroverted facts above – reasonably conclude that Peck is the officer responsible for those actions.  See Kowolonek v. Moore, 463 F. App'x 531, 538-39 (6th Cir. 2012) (summary judgment in favor of officers

affirmed where tasered plaintiff bringing excessive force claim failed to identify which of the four defendant officers employed the taser).[10]

In any event, even if there were any evidence putting Peck at the scene during the scuffle (there is not, other than Plaintiff and Wilhelm's vague and nonspecific reference to a "white" police officer), there is no evidence that he had access to a baton that he could have then used to strike Plaintiff.  In light of Peck's uncontroverted testimony that he was not carrying a baton on the day in question, Plaintiff has the burden to come forward with evidence demonstrating otherwise.  He has not done so.

Nor could a reasonable jury conclude that Donastorg struck Plaintiff with a baton.  This is because Wilhelm testified that the baton-wielding police officer was white, and it is undisputed that Donastorg is not white.

Further, even if a reasonable jury could find that one of the two defendant police officers herein struck Plaintiff with a baton, the force employed under the circumstances was not excessive.  Wilhelm's testified that immediately prior to the baton strike, Plaintiff failed to obey a police officer's lawful commands:

> Q:     So they're [the police officers] are searching him [Plaintiff] and the all of
>        a sudden one of them hits him with the baton.

---

[10] Plaintiff's reliance on <u>Pope v. Klemens</u>, No. 90-CV-55 (W.D. Mich. Feb. 18, 1992) is misplaced.  The plaintiff in <u>Pope</u> sued several police officers, claiming that one of them used excessive force against him during a raid of an apartment at which the plaintiff was present.  Because the culpable police officer was wearing a mask, the plaintiff could not identify which of the several defendants actually perpetrated the use of force against the plaintiff.  The court concluded that the plaintiff's excessive force claim should not be precluded based on the plaintiff's failure to identify the particular defendant responsible – because all of the officers acted "jointly or in a conspiracy" and were therefore subject to joint and several liability – "as long as plaintiff can show that it was one of the defendants to this action."  Here, unlike in <u>Kowolonek</u>, there has been no sufficient showing that it was one of the defendant police officers who was responsible for employing the force in question.

> A:      No.  When I walked up they had him face first to the truck at the back of the truck.  And when I walked up they were searching him.  He was complaining of his arm hurting him.  <u>Then they told him to put his arms behind his back, and he told them he couldn't put his left arm back there again, his left arm was hurting</u>.  And that's when they hit him with the baton.

Wilhelm Dep. at 28 (emphasis added).  The Sixth Circuit has held that even minor or passive noncompliance with a lawful police order during the course of an arrest can justify an officer's reasonable use of force, even when the arrestee conveys that he is physically unable to comply with the officer's lawful order.  For example, the police officer in <u>Marvin v. City of Taylor</u>, 509 F.3d 234, 238 (6th Cir. 2007), grabbed the arm of a nonviolent elderly man in the course of arresting him for drunk driving, and – after the elderly man told the officer that he could not physically put his arms behind his back when commanded to do so – the officer kicked him, knocked him down, and snapped his arm behind his back, resulting in injuries.  The Sixth Circuit held that the amount of force used was reasonable, under the circumstances.  <u>Id.</u> at 245-48. <u>Marvin</u> is controlling here.[11]

Plaintiff argues that the Sixth Circuit's decisions in <u>Solomon v. Auburn Hills Police Dep't</u>, 389 F.3d 167 (6th Cir. 2004) and <u>Vance v. Wade</u>, 546 F.3d 774 (6th Cir. 2008), among other similar cases, are controlling here.  They are not.  The police in <u>Solomon</u> told the arrestee to leave a movie theater because she did not buy a ticket and was being arrested for trespassing.

---

[11] Plaintiff attempts to distinguish <u>Marvin</u> by arguing that the elderly man there, unlike Plaintiff here, was (i) extremely intoxicated – thus creating a volatile and unpredictable situation – and (ii) noncompliant with a lawful police order.  It is true that there is no evidence that Plaintiff was intoxicated; however, Plaintiff testified that he had been upset and yelling, and essentially admitted that he had talked back to law enforcement.  This behavior also created a volatile situation.  Regarding noncompliance, Plaintiff here, like the plaintiff in <u>Marvin</u>, failed to obey a lawful order.  Although Plaintiff may have had a physical condition that made compliance difficult or impossible, Plaintiff has provided no authority holding that an officer may not use force to compel compliance with an otherwise lawful demand where the commanded party merely claims inability to comply.

After the plaintiff complied with officer's order to exit the theater and had one hand in handcuffs, another officer twisted her other arm and forced her to the ground. The Sixth Circuit found that the second officer's actions were unreasonable under the circumstances because the suspect complied with the orders and "was not actively resisting arrest." Likewise, in Vance, the Sixth Circuit reversed the trial court's grant of summary judgment in an excessive force case where the plaintiff's version of the events established that force was applied after the plaintiff was secured in custody and after the situation had been diffused. See also Zantello v. Shelby Twp., 277 F. App'x 570, 574 (6th Cir. 2008) (fact issue on excessive force; although arrestee was arrested for the violent crime of felonious assault, "[t]he problem for the officers is that . . . they continued to use force even after they had full control of the scene and even after [the arrestee] cooperated with them.")

Solomon, Vance, and Zantello all involve situations where force was applied after the situation was diffused. In the present case, viewing the facts in the light most favorable to Plaintiff, and accepting his version of events as true, all force in question was applied during the altercations and not after they had already ended. Therefore, Solomon, Vance, and Zantello are not controlling here, as the present case does not involve a situation where force was applied after it was no longer necessary. Nor are the other cases referenced by Plaintiff controlling. See Miller v. Sanilac County, 606 F.3d 240, 253-54 (6th Cir. 2010); Carpenter v. Bowling, 276 F. App'x 423, 426 (6th Cir. 2008); Lustig v. Mondeau, 211 F. App'x 364, 370 (6th Cir. 2006); Burden v. Carroll, 108 F. App'x 291, 293 (6th Cir. 2004). In all these cases, gratuitous force was applied toward non-resisting arrestees who were being arrested for non-violent crimes.

18

Moreover, Plaintiff does not have a viable excessive force claim against Donastorg or Peck based on their purported failure to act.  A police officer who fails to act to prevent the use of excessive force may be held liable when

> (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring.

Turner v. Scott, 119 F.3d 425, 429 (6th Cir. 1997).  The burden of establishing the two elements of the Turner framework rests on the plaintiff.  Id.  Specifically, with regard to the second element of the Turner framework, the plaintiff must show that the incident lasted long enough to allow the passive officer sufficient time to intervene.  As stated by the Sixth Circuit, it must be shown that the "underlying episode of excessive force . . . spanned a sufficient period of time for a nearby defendant to both perceive what was happening and intercede to stop it."  Ontha v. Rutherford Cnty., 222 F. App'x 498, 506 (6th Cir. 2007).  Compare id. at 501, 506-07 (finding no failure-to-intervene where instance of excessive force lasted six or seven seconds) with Durham v. Nu'Man, 97 F.3d 862, 868 (6th Cir. 1996) (reversing award of summary judgment for the defendant where a beating "lasted approximately ten minutes" and the defendant nurse "watched the beating unfold on her monitor from the nurse's station, and then from the doorway of . . . the room where the beating took place").

Plaintiff's brief contains no discussion of the Turner factors.  In fact, it does not even reference the Turner factors.  In addition, Plaintiff's theory with regard to his failure to act claim is hopelessly unclear.  For example, Plaintiff does not make clear whether his claim is premised on a failure to prevent the use of force by one of the Hurley guards, or what specific underlying instance of force Donastorg and/or Peck failed to prevent.  The Court cannot speculate as to the

basis for Plaintiff's claim, nor can it analyze the claim on his behalf.[12]  Plaintiff has fallen far short of demonstrating a viable failure-to-act claim.

## V.  MITCHELL'S SUMMARY JUDGMENT MOTION

Plaintiff does not assert an excessive force claim against Mitchell; rather, he asserts only assault and battery claims against him.  As the Court has disposed of all of the claims over which it has original jurisdiction (i.e., the federal claims), it declines to exercise continued supplemental jurisdiction over the remaining state law claims, including those asserted against Mitchell.  See 28 U.S.C. § 1367(c)(3); United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966) ("[I]f the federal claims are dismissed before trial, . . . the state claims should be dismissed as well.").  Accordingly, the state law claims against Mitchell will be remanded.

## VI.  CONCLUSION

For the foregoing reasons, summary judgment is granted in favor of Donastorg and Peck with regard to the excessive force claims asserted against them.  The remaining claims in this case (i.e., assault and battery claims asserted against all three Defendants) are brought under state law, and the Court declines to exercise continued supplemental jurisdiction over those claims.

---

[12] Plaintiff discusses his failure-to-act claim at pages 13-14 of his brief.  He first discusses two dated cases, Bruner v. Dunaway, 684 F.2d 422 (6th Cir. 1982) and Smith v. Ross, 428 F.2d 33 (6th Cir. 1973), both recognizing a cause of action for excessive force based on an officer's failure to act.  Plaintiff then applies the two cases discussed by writing, in full:

> As such, just because a Defendant may not have actually physically touched Plaintiff is of no consequence and does not absolve them of potential liability. The officers, even if they did not physically touch Plaintiff, were in a position to stop the excessive force from taking place and/or continuing.  Their failure to do so creates liability, and requires the instant Motion to be denied in its entirety.

This analysis is non-specific and conclusory.  Plaintiff does not specify which "officers" he is referring to, nor does he discuss whether the two elements of the Turner framework are satisfied.

See 28 U.S.C. § 1367(c)(3); Gibbs, 383 U.S. at 726.  Accordingly, those claims are remanded to

the Genesee County Circuit Court, State of Michigan.

      SO ORDERED.


Dated:  November 15, 2012            s/Mark A. Goldsmith
        Flint, Michigan               MARK A. GOLDSMITH
                                      United States District Judge

## CERTIFICATE OF SERVICE

      The undersigned certifies that the foregoing document was served upon counsel of record
and any unrepresented parties via the Court's ECF System to their respective email or First Class
U.S. mail addresses disclosed on the Notice of Electronic Filing on November 15, 2012.

                               s/Deborah J. Goltz
                               DEBORAH J. GOLTZ
                               Case Manager